**In re MULBERRY PHOSPHATES, INC., f/k/a Royster Company, et al., Debtors.**

**Bankruptcy Nos. 91–7012–8P1 through 91–7014–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 5, 1993.

John K. Olson, William Rochelle, for debtor.

Mark D. Silverschotz, Jeffrey Warren, for creditor's committee.

Richard Prosser, C. Ross Reeves, for Superfo.

Mark D. Bloom, M.O. Sigal, Jr., for C.I.T. Group.

Hywel Leonard, Francis Carter, for Intern. Nederlanden Banks, N.V.

Scott Newman, for Fertilizer Development & Investments, B.V.

Cindy LoCicero, for Chesapeake Plant, M.P.I.

Thomas Mimms, for Norsk Hydro U.S.A., Inc.

Stephen Blauner, Leonard Gilbert, for NMB Postbank Group, N.V.

Philip H. Trees, for Brimstone Group, Ltd.

Arnold H. Slott, for Royster–Clark, Inc.

Douglas P. McClurg, for Seminole Fertilizer Group.

David Eaton, for C.F. Industries, Inc.

Shirley C. Arcuri, Michael Tamburini, for Great Salt Lake Minerals.

Frank E. Hamilton, Jr., for Intern. Chemical Worker's Union.

William Knight Zewadski, Jeffrey Schwartz, for CIBA–GEIGY Corp.

Patrick Sullivan, A. Peter Lubitz, for Chilean Nitrate Corp.

David Fleischer, for Commodities–Trading Intern.

Thomas Cabaniss, Raymond C. Farfante, Jr., for Sovran Bank, N.A.

Susan Lively, for U.S. Dept. of Justice.

Sarah Kistler, Asst. U.S. Trustee.

## ORDER ON FIFTH AMENDED JOINT PLAN OF REORGANIZATION

ALEXANDER L. PASKAY, Chief Judge.

THE MATTER under consideration in these consolidated Chapter 11 cases involving Mulberry Phosphates, Inc., f/k/a Royster Company and two of its subsidiaries, Mid–Atlantic Fertilizer and Pennsylvania Fertilizer, Inc. (Debtors), is the Fifth Amended Joint Plan of Reorganization (Plan). The Plan, which has obtained the full approval of the Official Creditors Committee and all impaired classes with the exception of one, now has the last obstacle before confirmation to overcome, the objec-

tion interposed by Superfos A/S and Superfos Investments Limited (Superfos). It is Superfos' contention that the Plan cannot be confirmed first, because it was not proposed in good faith and therefore, violates § 1129(a)(3) of the Bankruptcy Code; second, because the Plan is not feasible because it is likely that it will be followed by liquidation or subsequent reorganization pursuant to § 1129(a)(11) of the Bankruptcy Code; and third, the Plan is not fair and equitable because Superfos will not receive the indubitable equivalent of its claim under the terms of the Plan as required by § 1129(b)(2)(A)(iii).

The facts relevant and germane to the proper resolution of the issues raised by Superfos, as established at the final evidentiary hearing are, as follows:

## HISTORICAL BACKGROUND AND EVENTS LEADING UP TO THE PRESENT CONTROVERSY

Prior to the commencement of these cases, Royster Company, now known as Mulberry Phosphates Inc. (MPI), one of the Debtors, was a major manufacturer and distributor of phosphate fertilizers and related products for domestic and export markets. MPI owned and operated an ammonia terminal located in the Port of Tampa, Florida (Tampa Terminal), and also held an interest in a pipeline system connected with the Tampa Terminal. In addition, the Debtors owned and operated a retail and wholesale distribution system selling fertilizers and other products used by the farming industry (Farm Marketing Group) and a diammonium phosphate facility located in Mulberry, Florida (Mulberry Plant). The Mulberry Plant consists of three separate operating units: (1) a sulfuric acid cogeneration plant (cogeneration facility) currently owned by The CIT Group/Factoring, Inc. (CIT), and leased by the Debtors; (2) a phosphoric acid plant; and (3) a diammonium phosphate plant producing diammonium phosphate (DAP).

On April 8, 1991, MPI and its subsidiaries, Mid–Atlantic Fertilizer, Inc. and Pennsylvania Fertilizer, Inc., filed their respective voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, in the United States Bankruptcy Court for the Southern District of New York. The Bankruptcy Court in New York ordered the joint administration of the Debtors' estates. On May 28, 1991, the Bankruptcy Court in the Southern District of New York granted a Motion to Transfer, and ordered the transfer of these Debtors' cases to this Court.

On January 15, 1992, shortly after these cases were transferred, the Debtors sold substantially all the assets of the Farm Marketing Group (FMG) to Royster Acquisition Corporation pursuant to this Court's Order entered December 20, 1991. In addition, the Debtors sold the Tampa Terminal and its pipeline interest on July 22, 1992, to CF Industries, pursuant to this Court's Order entered June 23, 1992. The Tampa Terminal sale was free and clear of liens, including the lien claimed by Superfos, with the proviso that all liens to the extent they are found to be valid were to be transferred to the proceeds of the sale. On November 25, 1992, this Court also approved the sale of the Chesapeake Facility, which had been a part of FMG, but not sold with the other assets of FMG. Thus, the Debtors' only remaining hard assets are the Mulberry Plant and the Debtors' leasehold interest in the cogeneration facility owned by CIT.

The net proceeds of the Tampa Terminal sale, i.e., approximately $21 million, are currently held by the Debtors' attorneys in a separate interest-bearing escrow account. Superfos has asserted an interest in the proceeds of the sale based on its claim which arises out of the Debtors' lease of the cogeneration facility from CIT. The background of this transaction plays a pivotal and central part to all matters under consideration.

## COGENERATION LEASE

In 1985, Superfos, then owner of the Debtors, and CIT, the owner of the cogeneration facility, entered into a 15–year lease (Lease). The facility is operated as a power plant generating electric power and served not only the needs of Superfos, who,

at that time, was the owner and operator of a phosphate processing plant manufacturing fertilizer, but also enabled Superfos to sell surplus electric power to utility companies. This surplus power is sold under a continuing contract with Florida Power & Light (FP & L). The FP & L contract terminates in the year 2002 and will generate an actual annual income of $7,028,-000.00 over the coming years.

The Lease required semi-annual payments of $1,540,388.39 by Superfos to CIT. In order to assure the performance of the Lease, CIT required Superfos to pledge U.S. Treasury Bonds (Bonds) in an unspecified amount, but no doubt sufficient to adequately protect the Lease payments. Superfos posted Bonds to secure the first 20 Lease payments due to CIT under the lease, or until 1995. In May, 1990, Superfos, with the consent of CIT, substituted the Bonds with a letter of credit (L.C.) in the amount of $15,009,156.00, issued in favor of CIT by Unibank.

In 1987, the Debtors acquired Superfos' interest in the cogeneration lease. In connection with this acquisition, the Debtors agreed to indemnify Superfos in the event the Debtors defaulted under the Lease with CIT and CIT drew on the L.C. pursuant to the original agreement between Superfos and CIT. This is precisely what happened. It should be noted, however, that when the Debtors filed their Petitions for Relief under Chapter 11 of the Bankruptcy Code on April 8, 1991, the Debtors were current on their obligations under the Lease and CIT and Superfos had no enforceable valid claim against the Debtors. It is equally without dispute, however, that the Debtors did default on the next two semi-annual payments, one of which became due on July 1, 1991, the other on December 1, 1991. As a result, CIT made a demand on the L.C. Unibank honored the demand and paid CIT $12,958,001.00. In turn, Unibank made a demand on Superfos to repay the same amount pursuant to its contract with Superfos. Superfos complied and paid Unibank the amount it paid to CIT.

On May 14, 1990, Superfos and the Debtors entered into an Indemnity Agreement, which replaced the original indemnity agreement (Debtors' Exh. 5A) of the Agreement. Provision § 3.2, entitled "Effect On Lessee's Obligations," provides that the liability of the lessee, i.e., the Debtors, under the Lease will not be affected by any amount of payment CIT might receive from the issuer of the L.C. in the event the Debtors are in default under the Lease and CIT elects to draw on the L.C.

On September 11, 1991, Superfos filed its secured proof of claim in the amount of $12,958,001.00, plus interest at prime, the rate provided for by the sale agreement entered into by Superfos and the Debtors. Internationale Nederlanden Bank N.V., f/k/a NMB Postbank Groep, N.V., and the Chase Manhattan Bank, N.A. (Banks), two creditors in this case, filed an Objection to Superfos' claim contending that this claim is contingent and, therefore, by virtue of § 502(c), cannot be allowed unless the contingency is removed either through actual litigation, or, if that is not possible, through estimation of the claim. In due course, the Banks' Objections were scheduled for pre-trial conference at which time the Court heard argument on the Banks' Motion for Summary Judgment. The Motion was denied by an Order entered on August 14, 1992. Thus, the Banks' Objection to the Claim of Superfos is still an outstanding and unresolved issue. Notwithstanding the unresolved objection, this Court temporarily allowed Superfos' claim for voting purposes by Order dated December 10, 1992. Not surprisingly, Superfos rejected the Plan under consideration.

## SALIENT PROVISIONS OF THE FIFTH AMENDED PLAN OF REORGANIZATION

Under the Plan, Fertilizer Development and Investment B.V. (FDI) will acquire all the newly-issued common stock of the Debtors in return for which FDI will provide the Debtors with $13 million in cash, to be used for working capital.

The Plan proposes to issue promissory notes to the Banks for approximately $44 million in principal and warrants allowing the Banks to purchase up to 20% of the

Debtors' new common stocks. Unsecured creditors whose claims are allowed will receive a pro rata share of $2.5 million of cash, the proceeds of the sale of the fixed assets of the Debtors' Chesapeake facility, and certain other assets, will also be used to fund the Plan.

The Plan also calls for the Debtors to buy out the Lease from CIT. The price of buy out is approximately $24,000,000.00. CIT is to receive the $24,000,000.00 by (1) giving credit for the $12,958,001.00 it has already received by drawing on the L.C. provided by Superfos, (2) accepting a transfer of ownership of the Debtors' $10.7 million of treasury bills now held in an escrow account to secure the payments due to CIT under the Lease, and (3) any shortfall will be made up by a cash payment from the proceeds of the sale of the Tampa Terminal on which Superfos had a lien.

The Official Committee of Creditors fully supports the Plan and have accepted the Plan by a large majority. In addition, both the Banks and CIT have accepted the Plan.

## THE SECURED CLAIM OF SUPERFOS

Superfos asserts that it has a secured claim in excess of $15 million secured by the proceeds of the sale of the Tampa Terminal. Included in the claim are the attorneys fees which Superfos has incurred since the outset of the Chapter 11 case, incurred, almost exclusively, through battling the Debtors from the very beginning of this case. Upon the filing of the Chapter 11 Petition, the principal amount of Superfos' claim after the drawing of the L.C. by CIT was $12,958,001.00. *See* Superfos' Proof of Claim dated September 11, 1991. Under its contract, Superfos' claim accrued interest at the prime rate (Debtors' Exhibit 5A, ¶ 11.11). Taking into account the changes in prime since the Chapter 11 cases began, interest accruals on Superfos' claim have aggregated $1,492,832.00 as of November 20, 1992. Thus, Superfos' claim with interest is in the approximate amount of $14,450,000.00. The difference between this amount and the amount now claimed by Superfos apparently represents the extraordinary amount of attorney's fees Su-

perfos has claimed to have incurred during the pendency of these Chapter 11 cases, fighting the Debtors' attempt to effectuate reorganization from the very beginning of the cases, and at every turn.

## THE TREATMENT OF THE CLAIM OF SUPERFOS UNDER THE PLAN

Under Article IX, Class 6A of the Plan, Superfos will receive a six-year note for the full amount of its allowed secured claim, with interest at prime plus one and one-half percent. The principal of the note will be amortized in six equal annual payments, and Superfos will receive semi-annual interest payments at the previously noted rate. Superfos' note will be secured by a first priority lien on, *inter alia*, the Debtors' cogeneration facility, the sulfuric acid plant and real property upon which the sulfuric acid and cogeneration plants are located. In addition, Superfos will receive a security interest in the Debtors' contract with FP & L, under which FP & L has agreed to purchase electricity produced by the cogeneration plant until April, 2002. It should be noted that the buy-out of the Lease by the Debtors will extinguish any additional exposure by Superfos, since Superfos' liabilities are contingent upon the Debtors' performance under the Lease. By buying-out the Lease, the Debtors' performance will no longer be an issue with regard to Superfos' claim against the Debtors.

## GOOD FAITH, VEL NON, OF THE FIFTH AMENDED JOINT PLAN OF REORGANIZATION

These are the salient aspects of the Plan, based on which Superfos contends that the Plan of Reorganization under consideration cannot be confirmed because first, it was not proposed in good faith, and, therefore, it fails to comply with § 1129(a)(3) of the Bankruptcy Code; second, the Plan is not feasible because it is likely that it will be followed by liquidation or subsequent reorganization pursuant to § 1129(a)(11) of the Bankruptcy Code; and third, in any event, the Plan is not fair and equitable because Superfos will not receive the indubitable equivalent of its allowed claim under the

Plan, as required by § 1129(b)(2)(A)(iii) for confirmation over the objection of a creditor who is impaired within the meaning of § 1124 of the Bankruptcy Code.

Concerning the first contention, the good faith requirement under § 1129(a)(3) of the Bankruptcy Code is satisfied if it appears that there is a reasonable likelihood that the Plan will achieve a result consistent with the purposes and objectives of the Bankruptcy Code. *In re Madison Hotel Associates, Inc.*, 749 F.2d 410, 425 (7th Cir.1984); *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable TV)*, 709 F.2d 762, 764–65 (1st Cir.1983); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D.Cal.1982). Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable chance of success, the good faith requirement of § 1129(a)(3) is satisfied. *B.M. Bright v. Sun Country Development, Inc. (In re Sun Country Development, Inc.)*, 764 F.2d 406, 408 (5th Cir.1985); *see, In re Wiggles*, 7 B.R. 373, 380 (Bankr.N.D.Ga.1989). In sum, what is necessary to meet the requirements of § 1129(a)(3) is assurance that the plan proposed is designed to achieve the legitimate goal of Chapter 11, after full and complete disclosure of all relevant facts. Thus, that all interested parties had been fully apprised of all relevant facts, had full knowledge and understanding of the plan, and in fact, cast their ballots on the plan, is generally a good indication that the plan has been proposed in good faith. The most telling aspect of good faith in this instance is, as noted earlier, that all constituents fully support the Plan, with the exception of Superfos. There is hardly any doubt that the interest of Superfos is not coexistent, but is, in fact, hostile to the interest of the other parties, some of whom, like the Banks, are very heavily involved financially in the affairs of these Debtors. To elevate the interest of Superfos and find that the Plan has not been proposed in good faith simply because Superfos does not like the treatment of its claim, is a proposition this Court is unwilling to accept.

## FEASIBILITY OF THE FIFTH AMENDED JOINT PLAN OF REORGANIZATION

The next contention of Superfos, asserted in opposition to the Plan under consideration, is the proposition that this Plan is not feasible, and therefore, cannot be confirmed by virtue of § 1129(a)(11) of the Bankruptcy Code. This is really the heart of this entire controversy. This contention of Superfos is based on the following: (1) that because of the depressed prices of DAP, the phosphoric acid plant cannot survive and will have to be abandoned; and (2) if that occurs, the operation of the cogeneration facility as a stand-alone plant is no longer economically viable. According to Superfos, this is so because there is no market for the excess sulfuric acid and, more importantly, the current storage facility is sufficient only to store a maximum of two day's production. Thus, according to Superfos, to operate the cogeneration facility as a stand-alone plant is not possible, and the facility will have to be sold for scrap. Taking the two propositions in combination, it is clear that, according to Superfos, the Debtors cannot survive as viable economic entities and either they have to be liquidated as soon as possible or as early as six months following confirmation, or will need additional reorganization which, if found by this Court, would prevent confirmation by virtue of § 1129(a)(11) of the Bankruptcy Code.

Section 1129(a)(11) provides that a plan may be confirmed only if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ..., unless such liquidation or reorganization is proposed in the plan." A plan meets the § 1129(a)(11) feasibility standard if the court determines that the plan offers a reasonable prospect of success and is workable. *5 Collier on Bankruptcy,* ¶ 1129.-02[11] at p. 1129–54 ("Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success."); *see also, Prudential Insurance Co. of America v.*

*Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir.1985); *In re Sovereign Oil Co.*, 128 B.R. 585, 586 (Bankr.M.D.Fla. 1991). Factors to be considered by the Court in evaluating the feasibility of a plan include the earning power of the business, its capital structure, economic conditions, the continuation of present management, and the efficiency of the management in control of the business after confirmation. *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985); *In re Sovereign Oil Co.*, 128 B.R. at 586.

▪ The success of the plan need not be guaranteed by the plan's proponent. Rather, the reviewing court must examine the totality of the circumstances to determine whether the plan meets the requirements of § 1129(a)(11). *5 Collier on Bankruptcy*, ¶ 1129.02[11] at p. 1129–54. The mere potential for failure of the plan is insufficient to disprove feasibility. *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required."); *see also, 5 Collier on Bankruptcy* ¶ 1129.02[11] at p. 1129–54.

▪ To determine the economic feasibility of the continued operation of the Debtors, the Court must of course, rely on testimony presented by experts. Needless to say, there is a vast difference between the opinions of the experts representing the Debtors and those representing Superfos, which is the usual scenario involving values and the future prospects of a debtor which attempts to survive as an ongoing business.

The expert presented by the Debtors, Marshall and Stevens, Incorporated (M & S), is a recognized expert in the phosphate industry, has been in business for 60 years and employs 100 professionals. M & S, in preparing their report, relied on the reports prepared by Blue, Johnson & Associates (Blue, Johnson) and Fertecon Research Centre (Fertecon). It is undisputed that Blue, Johnson and Fertecon are leaders in the industry who regularly publish projec-

tions and market analyses. For instance, Blue, Johnson publishes monthly fertilizer industry reports summarizing U.S. and international fertilizer activity. Blue, Johnson also publishes industry forecasts annually. Fertecon also regularly publishes forecasts for the fertilizer industry as well as weekly newsletters on the sulfur sulfuric acid, ammonia and DAP sectors of the industry. In sum, the projections of M & S were not prepared for this trial but as an authoritative projection based on in-depth empirical studies.

Superfos hired the valuation consultants Lloyd–Thomas/Coats & Burchard Co (Lloyd–Thomas). Superfos relied upon the opinions of John Spude, a Finance Valuation appraiser with Lloyd–Thomas, and Arthur J. Roth, an independent consultant experienced in phosphate fertilizer markets. Mr. Spude stated that his conclusions are based on the opinion of Mr. Roth, the validity of which is dependent upon the assumption that Mr. Roth's conclusions were reasonable and well founded. In addition, there is no question that according to the American Society of Appraisers (ASA), Mr. Spude's appraisal can only be accepted as a "limited appraisal," which is defined as:

an estimate as to the value of a business ... which lacks the performance of additional procedures that are required in an appraisal. Limited appraisal has the following qualities: ... (2) It is based upon consideration of limited relevant information ... (3) The appraiser conducts only limited procedures ...

Based on the record established and balancing the respective value of the expert testimony, this Court is satisfied that the Debtors have a realistic chance to survive as a viable operating entity if the Plan is confirmed and will not be thrown into liquidation or will not need any further reorganization for the following reasons:

This Court is satisfied that historically the DAP price always had wide fluctuations in the past and has no reason to believe that the market will not experience a radical upswing again from the actual lowest price level, a conclusion fully sup-

ported by empirical data. Moreover, there is credible evidence to support the proposition that the costs of production will follow this historical pattern, and the rock price will bear the same relationship to the sale price as it has in the past. Thus, as the DAP price increases, the rock price and the price of ammonium and sulphur increases basically in the same ratio contrary to the opinion of Mr. Roth, the expert testifying on behalf of Superfos.

In addition, FDI has already deposited $2 million in cash to cover its obligations under its contract. The $2 million plus interest are being held in escrow by Citibank. (See Debtors' Exh. 2). Upon confirmation, the Debtors will have available approximately $20.5 million in cash, of which the Debtors' propose to spend $7 million on capital improvements and to pay the expense of turnarounds of the phosphate plant, leaving $13.5 million in cash. (See Debtors' Exh. 2). From the foregoing it appears that the funds available are more than sufficient to accomplish the proposed rehabilitation of the Debtors, including consummation of the proposed Plan. Based on the foregoing, this Court has no difficulty in concluding that the Plan is feasible under the standard set forth in § 1129(a)(11) of the Bankruptcy Code.

## INDUBITABLE EQUIVALENT

■ This leaves for consideration the last contention of Superfos, that the terms of the Plan dealing with the second claim of Superfos is not fair and equitable and the Plan does not give Superfos the indubitable equivalent of the value of its claim, and therefore, the Debtors failed to establish that they met the requirement of § 1129(b)(2)(A)(iii). Under the Plan, Superfos will receive a replacement for its original collateral, i.e., its lien on the Tampa Terminal and the pipeline, with the first lien on the sulfuric acid cogeneration plant. In addition, the Plan grants the security interest to Superfos in the FP & L contract.

The Plan of Reorganization submitted by the Debtors may be confirmed despite the rejection of the plan by an impaired class of creditors if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. § 1129(b)(1). A plan will be fair and equitable if it satisfies subsections (i), (ii), or (iii) under § 1129(b)(2)(A) of the Bankruptcy Code with regard to secured creditors.

■ Subsection (ii) provides that the original collateral of the secured creditor may be sold, free and clear of liens, with the liens attaching to the proceeds of the sale. These liens then must be treated under Subsections (i) or (iii). Subsection (iii) provides that the secured creditor must receive the indubitable equivalent of its claim. A debtor is not required to provide holders of allowed secured claims with strict cash equivalence. *In re San Felipe & Voss, Ltd.*, 115 B.R. 526 (S.D.Tex.1990). In the determination of whether the plan provides the secured creditor the indubitable equivalent, courts have considered whether the substitute security is completely compensatory, and the likelihood that the secured creditor will be paid. *Matter of Sun Country Development, Inc.*, 764 F.2d 406 (5th Cir.1985) *citing, In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935). The substitute collateral must be the equivalent of the amount of the secured claim, not the original collateral. *In re Temple Zion*, 125 B.R. 910 (Bankr. E.D.Pa.1991). Therefore, in analyzing the treatment of Superfos under the Debtors' Plan, this Court must look at the likelihood that Superfos will be paid in full, in the event of default by the value of the replacement collateral.

■ Superfos contends that the cogeneration facility and sulfuric acid plants must be valued as scrap. The Debtors contend that the proper method of valuation of these facilities is as going concerns. This Court is constrained to agree with the Debtors.

In the normal operation of the sulfuric acid and cogeneration facility, steam and the sulfuric acid manufactured in the sulfuric acid plant are transported by pipes to the phosphoric acid plant where the sulfuric acid is mixed with phosphate rock to

form phosphoric acid. Without steam from the sulfuric acid plant, the phosphoric acid plant cannot manufacture phosphoric acid in a strong enough concentration to constitute a commercial grade of phosphoric acid for fertilizers. The phosphoric acid is then transported by pipe to the diammonium phosphate plant where the phosphoric acid is combined with ammonia to produce a dry granular product known as diammonium phosphate or DAP.

The viability of the cogeneration facility as a stand-alone operation is, of course, hotly disputed and central to the determination of the facility's value. According to Superfos, the facility is not viable as a stand alone operation for two reasons: first, lack of storage facilities for sulfuric acid; and second, inability to sell the sulfuric acid produced.

There is no question that the sulfuric acid cogeneration facility is an indispensable component of the Mulberry Plant. This is so because the phosphoric acid plant cannot produce commercial grades of phosphoric acid without steam from the sulfuric acid plant.

The optimum situation would be that the fertilizer plant operates and the sulfuric acid produced finds a ready market nearby with minimal transportation costs, giving it a great competitive advantage over producers of the same commodity. However, even assuming, without admitting, that the fertilizer plant will fall into the hands of a non-affiliate, common sense dictates that the new owner and operator of the plant would procure the sulfuric acid needed to manufacture the phosphoric acid from the cogeneration facility rather than go to the market and acquire the commodity at much greater expense due to transportation costs.

Even assuming that the fertilizer plant is to be out of commission and scrapped, this Court is satisfied that it could operate as a stand-alone plant and is constrained to reject the proposition that because of lack of a storage facility or lack of a sufficient market, it cannot survive. There is credible evidence in this record to support the proposition that there is a large enough market and demand for this commodity in the central Florida area that daily production could be sold and transported, and there would not be any need for a long-term storage facility. In addition, the revenue generated from the operation of the cogeneration facility, as noted earlier, is in excess of $2 million per year. This being the case, this Court is satisfied that the cogeneration facility is a very valuable income-generating unit and it could operate on its own as a stand-alone plant.

Obviously, as asserted by Superfos, if the cogeneration facility is sold for scrap, it would not yield more than $1.3 million. This Court is satisfied that this method of valuation is inappropriate. It is hard to believe that anyone with any sense would liquidate and sell for scrap a facility which has a proven income-producing capacity and does, in fact, produce a large income through the production of electric power which it sells to FP & L.

According to the testimony of Mr. Johnson, the sulfuric acid produced by the cogeneration facility at this time represents only 3% of the total market in Central Florida. The Central Florida market imports approximately one million tons of sulfuric acid per year and clearly, the excess produced could easily be marketed by replacing the imports. It is without dispute that sulfuric acid is a commodity in great demand in Central Florida and, according to Mr. Johnson, the sulfuric acid produced by the cogeneration facility could easily be sold and shipped on the very day it is produced, without having any storage problems.

According to M & S, the chemical plant at Mulberry, which includes the sulfuric acid cogeneration facility, has a fair market value of $42,153,000.00. M & S also determined that the sulfuric acid cogeneration plant has a market value of $23,168,000.00 or more than half the appraised value of the entire chemical plant when all units are operating cooperatively. As Superfos' claim is approximately $15 million, it is clear that the value of the substitute collateral will fully satisfy Superfos' claim, and

therefore, Superfos is receiving the indubitable equivalent of its claim.

 It is important to note that Superfos' reliance on the market value of the note offered under the Debtors' Plan is misplaced. The note and mortgage need not be convertible to cash, or have a market value equal to the allowed amount of the claim. Instead, the relevant inquiry is whether the substitute collateral has a value equal to the amount of the allowed secured claim.

Based on the total picture, this Court is satisfied that the cogeneration plant is worth at least $23 million dollars compared to the Mulberry plant's entire value of approximately $42 million, thereby satisfying the requirement of § 1129(b)(2)(iii). This Court is satisfied that Superfos will receive the indubitable equivalent of its claim under the Debtors' Plan.

### CONCLUSION

In sum, while there is always doubt when projecting the future operation of a business, based on the testimony on this record, and not the testimony of the experts, this Court is satisfied that the Plan has been proposed in good faith, is feasible and offers Superfos the indubitable equivalent of its claim. Thus, no obstacles to confirmation remain and this Court finds that the Debtors' Plan does comply with the requirements of § 1129(a)(10) and should be confirmed.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objections to Confirmation filed by Superfos are hereby overruled. It is further

ORDERED, ADJUDGED AND DECREED that the Fifth Amended Plan of Reorganization is hereby confirmed.

DONE AND ORDERED.