**In re FOXRIDGE LIMITED PARTNERSHIP,**
Debtor.

**Bankruptcy No. 98–43488.**

United States Bankruptcy Court,
W.D. Missouri,
Kansas City Division.

July 28, 1999.

---

Bruce E. Strauss, Merrick Baker Hufft Strauss, Kansas City, MO, for Debtor.

Benjamin J. Mann, Blackwell Sanders, Kansas City, MO, for Businessmens Assurance Co. of America.

Scott J. Goldstein, Spencer, Fane, Britt & Browne, Kansas City, MO, Thomas Mullinix, Evans & Mullinix, Lenexa, KS, for Bond Puchase, L.L.C.

John W. McClelland, Schlomann McClelland PC, Kansas City, MO, for Real Estate Equities, Inc.

Ronald S. Weiss, Berman, DeLeve, Kuchan & Chapman, Kansas City, MO, for Equity Security Holders.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

This Court held a confirmation hearing in this Chapter 11 bankruptcy case on July 26, 1999. At that hearing debtor asked for confirmation of its Fifth

Amended Plan of Reorganization. Bond Purchase, L.L.C., which had filed a competing Plan, did not proceed to confirmation with its Plan. The confirmation of debtor's Fifth Amended Plan of Reorganization (the Plan) is a core proceeding under 28 U.S.C. § 157(b)(2)(L) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). There is, however, a potential issue as to subject matter jurisdiction, which was raised by Bond Purchase, L.L.C., (Bond Purchase) in its Motion to Dismiss for Lack of Subject Matter Jurisdiction and Suggestions in Support Thereof, which was filed on November 9, 1998.[1] That motion was later withdrawn without prejudice to its being filed at any later time.[2] Since subject matter jurisdiction can be raised at any time, this Court wishes to address the issue at this time and incorporate those findings of fact and conclusions of law into the Order confirming Foxridge's Plan. Thereafter, this Memorandum Opinion will address the confirmability of debtor's Plan. The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. ISSUES PRESENTED

A. The Limited Partnership Agreement provided that Foxridge Limited Partnership terminated on December 31, 1996. After the Partnership terminated, a majority of the limited partners voted to remove the general partner, Benchmark Management, Inc. (Benchmark), and install a new general partner, KelCor, Inc. (KelCor). The dispute as to whether Benchmark had been properly removed as general partner of Foxridge was before a mediator at the time this Chapter 11 case was filed by Benchmark, as the representative of Foxridge. Bond Purchase, a lim-

ited partner, challenged the authority of Benchmark to file the case in this Court and, assuming Benchmark did not have standing to file the case, this Court's subject matter jurisdiction. Kansas' limited partnership law provides that general partners who have not wrongfully dissolved a limited partnership may wind up the limited partnership's affairs. Can the filing of a Chapter 11 bankruptcy petition, and the reformation of the limited partnership as part of the reorganization, be construed to be winding up the limited partnership's affairs?

B. The Fifth Amended Plan of Reorganization proposed by debtor has been approved by all impaired classes of claims. All unimpaired creditors are to be paid in cash on or before the Effective Date. As to holders of limited partnership interests, such holders are to either retain their interests, or allow them to be sold at auction. Does the Plan comply with the confirmation requirements of 11 U.S.C. § 1129?

## II. DECISION

A. This case is properly before this Court. Upon dissolution of a limited partnership, and until a certificate of cancellation is filed, the general partner may file civil suits on behalf of the partnership. The filing of a Chapter 11 bankruptcy petition is analogous to filing a civil suit on behalf of the partnership. Thus, Benchmark had standing to file this Chapter 11 bankruptcy petition.

B. The Plan proposed by debtor meets the requirements of 11 U.S.C. § 1129, and is confirmable.

## III. FACTUAL BACKGROUND

Foxridge was formed in 1981 to purchase the Foxridge Apartments. On March 9, 1990, Benchmark became the general partner of Foxridge. The Limited Partnership Agreement (the Agreement) provided that the partnership would termi-

---

1. Doc. # 51 and 52.

2. Doc. # 101.

nate on December 31, 1996. The Agreement also provided that the termination date could never be amended. Despite that language, Foxridge continued to operate after December 31, 1996, and efforts to reform the limited partnership were not successful.

Bond Purchase obtained 6 Foxridge limited partnership shares, or 13.2 percent of the limited partnership, on December 31, 1997, after the partnership had terminated. Shortly after obtaining its shares, Bond Purchase contacted other limited partners for the purpose of removing Benchmark as the general partner. At a "limited partners" meeting held in February of 1998, Bond Purchase contends that a majority of the limited partners voted to remove Benchmark as the general partner and install KelCor, an entity controlled by Bond Purchase's principal. Benchmark contends that it was not validly removed, and the matter was placed before a mediator. Benchmark filed this Chapter 11 case before the mediator could hold a hearing to determine whether Benchmark had been validly removed as the general partner.

Real Estate Equities (REE) holds a second mortgage secured by a Deed of Trust as to some of the real estate owned by Foxridge. This Court has previously found that REE has an allowed claim in this bankruptcy in the amount of $525,536, of which $12,600 is secured and $512,936 is unsecured. REE began collection efforts on its mortgage after December 31, 1996, and after Bond Purchase began its efforts to remove Benchmark as general partner. Some payments were made on the note, but REE alleges that Foxridge ultimately defaulted, so it commenced a suit in state court on August 5, 1998 to foreclose its interest under its Deed of Trust. On August 19, 1998, Foxridge filed this Chapter 11 bankruptcy case.

Bond Purchase filed a motion to dismiss the case on September 3, 1998,[3] and a Supplemental Motion to Dismiss on September 24, 1998.[4] In the Supplemental Motion Bond Purchase argued that Benchmark was not the appropriate party to file this case, therefore, the case should be dismissed. On October 13, 1998, this Court denied that motion because Bond Purchase offered no evidence at the hearing to prove the allegations in its Supplemental Motion.[5] Bond Purchase then filed another Motion to Dismiss for Lack of Subject Matter jurisdiction on November 9, 1998, which was withdrawn without prejudice, however, the issue of subject matter jurisdiction has never been resolved.

Debtor's only asset is the Wellington Club Apartments. Debtor's Fifth Amended Plan represents the culmination of a process in which two competitors have attempted to gain control of that property. The two competitors are John Bennett, who owns REE, and David Johnson, who owns Bond Purchase. Subsequent to the filing of the case, Mr. Bennett purchased from third parties a 33.10% limited partnership interest in the debtor in the name of Wellington, L.L.C. (Wellington). Bond Purchase has filed an adversary proceeding challenging Wellington's purchase of those interests.

The debtor's debt structure consists of a secured claim due Businessmen's Assurance Company of America (BMA) in the approximate amount of $6.55 million, secured and unsecured claims of approximately $525,000.00 due REE, and trade debt of approximately $40,000.00. The debtor previously submitted an appraisal valuing the property at $7.1 million, barely more than the debts owed. Bond Purchase, in connection with an earlier plan, contended that the property has a liquidation value of $6.96 million.[6] It has be-

---

**3.** Doc. # 11.

**4.** Doc. # 27.

**5.** Doc. # 30.

**6.** Doc.# 105 at pg. 3 (Bond Purchase L.L.C.'s Disclosure Statement, filed December 15, 1998).

come apparent, however, that the property now has a value well in excess of debtor's debts.

As noted, this Chapter 11 case was precipitated by a continuing battle for control of the solvent debtor, between Bennett and Johnson. The strategic maneuvering between these gentlemen has continued postpetition. Bond Purchase has, for example, filed two separate actions to equitably subordinate claims or interests held by Bennett entities. The one fact that both sides do agree on, however, is that these apartments are in desperate need of repairs, maintenance and updating, at a cost of approximately $1.25 million. And, if these repairs are not made, the property could, in short order, be worth less than the debt against it. In order to give both Johnson and Bennett the opportunity to gain control, the Court terminated the exclusivity period, and gave both of them the opportunity to file Plans by January 19, 1999, which they did. Each offered a Plan that would have made funds available for work on the property, and that would have offered existing limited partners the option of either staying in the partnership, or selling their interest at a price of up to $7,000 per one percent interest. The Court denied Confirmation of both Plans for various reasons, the pertinent one here being that both Plans offered the distinct possibility that Bennett and Johnson would remain in business together.[7] Ultimately, I found that, in the unique circumstances of this case, a Plan is feasible only if the Court determines that the Plan offers a reasonable prospect for success and is workable.[8] I found that, given Johnson and Bennett's history of litigating for control of the debtor, and given this debtor's need for an immediate infusion of capital, a plan would not be viable in the face of a continuing struggle for control. Thereaf-

ter, the debtor filed the Plan at issue here. This Plan provides that an auction will be held to sell the interests of both the Bennett and Johnson entities, as well as those of any other limited partners who choose to sell. Wellington has represented that it is prepared to begin the bidding at $15,-000.00 per one percent unit.

The Plan most recently proposed by Bond Purchase provided that the interests held by Wellington would be purchased either at the price paid by Wellington, which was approximately $7,000.00 per one percent unit, or at such other value as determined by the Court. The Bond Purchase Plan offered all other limited partners the option of either selling their shares for $7,000 per one percent unit, or retaining their interests. But the Bond Purchase Plan also attempted to retain the right to match any competing offers as to the other limited partnership shares.[9] The differences in the Plans as to treatment of creditors are not relevant here.

All limited partners, other than Bond Purchase, voted in favor of debtor's Plan. At the Confirmation Hearing Bond Purchase offered no evidence or argument in favor of its Plan, so Confirmation of that Plan will be denied.

I turn first to a discussion of this Court's jurisdiction, an issue previously raised by Bond Purchase, and then to whether debtor's Plan should be confirmed.

## IV. DISCUSSION

### A. JURISDICTION

■ This Court has jurisdiction to hear and determine cases that are properly filed under title 11:

(a) Each district court may provide that any or all cases under title 11 . . .

---

7. Docs. #199 and #200 (Memorandum Opinion and Order Denying Confirmation, filed April 30, 1999).

8. *In re Mulberry Phosphates*, 149 B.R. 702, 709 (Bkrtcy.M.D.Fla.1993). *See also, In re*

*Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1985).

9. Doc. #208 (Bond Purchase L.L.C.'s Third Amended Plan, filed May 17, 1999).

shall be referred to the bankruptcy judge for the district.

Bankruptcy judges may hear and determine all cases under title 11 ... and may enter appropriate orders and judgments, subject to review under section 158 of this title.[10]

But bankruptcy courts are courts of limited jurisdiction, therefore, the first inquiry this Court must make is whether this is a case under title 11. In other words, was the Chapter 11 case filed by an entity with the authority to file the case. In order to determine if Benchmark had the authority I must first determine the effect of the termination clause in the Limited Partnership Agreement. Article III of the "AGREEMENT OF LIMITED PARTNERSHIP FOXRIDGE LIMITED PARTNERSHIP" (the Agreement) provides:

The Partnership shall commence with the filing of a certificate of limited partnership in accordance with the laws of the State of Kansas, which shall be immediately prior to the acquisition of the Property, and shall terminate as of December 31, 1996.[11]

By the express language of the Agreement, I find that the partnership terminated on December 31, 1996. That does not end the matter, however, because once a partnership has been terminated the general partner is obligated to wind up the affairs of the partnership. This partnership was formed in the State of Kansas pursuant to the provisions of the Uniform Limited Partnership Act of the State of Kansas.[12] Kansas' Revised Uniform Limited Partnership Act provides as follows:

(a) Unless otherwise provided in the partnership agreement, the general partners who have not wrongfully dissolved a limited partnership, or if none, the limited partners may wind up the limited partnership's affairs; but the district court, upon cause shown, may wind up the limited partnership's affairs upon application of any partner or the partner's representative or assignee.

(b) Upon dissolution of a limited partnership and until the filing of a certificate of cancellation as provided in K.S.A. 56–1a506 and amendments thereto, the persons winding up the limited partnership's affairs, in the name of, and for and on behalf of, the limited partnership, may prosecute and defend suits, whether civil, criminal or administrative, gradually settle and close the limited partnership's business, dispose of and convey the limited partnership's property, discharge the limited partnership's liabilities, and distribute to the partners any remaining assets of the limited partnership, all without affecting the liability of the limited partners.[13]

The issue, therefore, is whether the filing of a Chapter 11 bankruptcy petition is a civil suit, or an effort to settle and close the partnership's business, or an effort to dispose of and convey the limited partnership's property. In *Mission Road Associates, L.P. v. IML Realty Company*,[14] the Kansas Court of Appeals held that a corporate general partner properly filed a lawsuit on behalf of a limited partnership that had no legal existence on the date the case was filed, if the lawsuit was for the purpose of winding up the affairs of the limited partnership.[15] The Court also held that whether an action is in fact "winding up" the affairs of a limited partnership is a factual question to be determined by the trial court.[16]

---

10. 28 U.S.C. § 157.

11. Doc. # 44, Ex. C, Attachment 1.

12. *Id.* at ¶ 1.01.

13. Ks. Stat. Ann. § 56–1a453 (Supp.1999)

14. 15 Kan.App.2d 388, 807 P.2d 1330 (1991).

15. *Id.* at Kan.App. at 391, 807 P.2d at 1332.

16. *Id.*

More on point, though not from Kansas, is *In re Pallet Reefer Company.*[17] In *Pallet Reefer* the joint venture agreement provided that any disputes would be resolved by arbitration.[18] Many disputes arose, and the parties all agreed to be bound by the arbitrator's decision. They also agreed that the joint venture agreement would be terminated on the date the arbitrator issued its award. The parties refused to be bound by the arbitrators award, however, and eventually, one of the partners of debtor filed an involuntary bankruptcy petition. The other partner in the joint venture immediately moved to dismiss the case on the grounds that the debtor was no longer in existence because the partnership had been terminated by agreement of the parties.[19] The bankruptcy court denied the motion. It found that an agreement to discontinue a partnership does not end the partnership, but rather charges the partners with winding up rather than carrying on the business.[20] The court then explained that any partnership, once formed, must continue until its affairs are wound up.[21] The court stated "the word 'terminate' ... is a misnomer. The affairs of [debtor] have not been wound up. Consequently, the debtor is an existing entity that is eligible for bankruptcy relief." [22] The Bankruptcy Code provides that a "voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter." [23]

■ Until properly removed the general partner of a limited partnership is the appropriate person to file a bankruptcy petition on the behalf of the partnership. Thus, Foxridge was an entity eligible for relief under Chapter 11, and Benchmark had the authority to file the case, even if the limited partnership had terminated by the terms of the Agreement. Such Chapter 11 filing was part and parcel of the winding up of the affairs of Foxridge. Since the case was properly filed, this Court has jurisdiction to process the case, and to confirm a Plan of Reorganization consistent with the requirements of the Bankruptcy Code.

For all of the above reasons, I find that this Chapter 11 bankruptcy was properly filed in this Court, and that this Court has jurisdiction over the case pursuant to 28 U.S.C. § 157(a) and (b).

## B. CONFIRMATION

■ At the hearing on Confirmation, evidence offered was sufficient to show that the debtor's bankruptcy Plan had been accepted by all impaired classes of claims. Evidence was also offered sufficient to show that of the holders of partnership interests, 86.796% had accepted debtor's Plan, and that only Bond Purchase, representing 13.204%, had rejected the Plan. Included in the partnership interests voting in favor of the Plan were those held by Wellington, L.L.C., representing 33.10% of the partnership. Prior to Confirmation, Bond Purchase filed a motion seeking to designate the vote of Wellington as having been solicited or procured in bad faith, pursuant to Section 1126(e),[24] or to invalidate its vote pursuant to Rule 3018 [25] of

17. 233 B.R. 687 (Bankr.E.D.La.1999).

18. *Id.* at 689.

19. *Id.* at 690.

20. *Id.*

21. *Id.*

22. *Id.*

23. 11 U.S.C. § 301.

24. 11 U.S.C. § 1126(e). The provision reads as follows:

(e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

25. Fed. R. Bankr.P. 3018. Rule 3018 provides in relevant part that equity holders may only vote on a Plan if the equity holder "is the

the Federal Rules of Bankruptcy Procedure.[26] This motion will be overruled. Bond Purchase offered no evidence in support of the motion. Bond Purchase argued, instead, that the interest held by Wellington was obtained after the filing of the bankruptcy petition, that Wellington is an insider, and that its vote should, therefore, not be counted. Under section 1126(e) of the Code, however, the issue is whether Wellington's vote on the Plan was solicited and procured in good faith. There is no evidence that it was not. Wellington, like all the limited partners other than Bond Purchase, has chosen to vote in favor of a Plan that provides that this solvent debtor will allow its limited partnership interests to be sold at auction to the highest bidder. Wellington, Bond Purchase, and anyone else who chooses to do so, will have the opportunity to submit bids. A vote in favor of such a Plan is not a vote in bad faith. And, since Wellington did purchase its interest prior to the hearing on this Disclosure Statement, it is entitled to vote under Rule 3018.[27]

■ In addition, the Bond Purchase motion to designate or invalidate the Wellington vote must be overruled because, even if the Class of limited partners had not voted in favor of debtor's Plan, the Plan would have been confirmable. The Code provides that, as to a class of interests which did not accept the Plan, the Plan shall be confirmed if all other requirements for confirmation are met, provided that the Class is paid an amount "equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest."[28] There is no evidence that the holders of limited partnership interests are entitled to any fixed liquidation preference or fixed redemption

price, therefore, they are entitled to the value of their interests. The Plan proposed by debtor establishes an auction procedure, through which the value of those interests will be determined. The Bond Purchase Plan offered limited partners $7,000 per one percent unit. The auction bidding is to start at $15,000.00 per unit. Both Johnson and Bennett have the right to participate in that auction. I find that, as a consequence, Johnson will receive at least the value of his interest.

■ I turn next to the objections to confirmation raised by Bond Purchase.[29] Bond Purchase first objects to its being classified with, and placed in a separate class with, Wellington, rather than being classified with the other limited partners. It was established at the hearing that the purchase price to be paid to Bond Purchase is the same as that to be paid to the other limited partners. And, as previously shown, a requisite percentage of limited partnership interests accepted the Plan, regardless of which class Bond Purchase was placed into. The only difference between the treatment of Bond Purchase and Wellington, on the one hand, and the other limited partnership interests, on the other, is that Bond Purchase and/or Wellington will be required to sell their partnership interests if they are not the successful bidder at the auction sale. There is, however, a valid reason for a different classification for Bond Purchase's and Wellington's partnership interests. No plan in this case is feasible if it contemplates a partnership in which both Bennett, as the owner of Wellington, and Johnson, as the owner of Bond Purchase, participate. Therefore, the auction procedure proposed by debtor contemplates that if either of these gentlemen prevails at the auction, the interests of the other will be pur-

holder of record of the security on the date the order approving the disclosure statement is entered."

**26.** Doc. # 242.

**27.** Id.

**28.** 11 U.S.C. § 1129(b)(1)(C).

**29.** Doc. # 239.

chased, at the price established at the auction. Given the avid interest that both Bennett and Johnson have shown in owning the debtor, and given a starting price well in excess of the appraised value of the property, the "loser" will receive at least the value of his interest. Although Bennett and Johnson are unable to do business with each other, there could well be other limited partners who are both able and willing to do business with either of them. No good purpose would be served by requiring the other limited partners to sell their interests; instead such limited partners are simply given the option to sell if they so choose.

The Eighth Circuit has recognized that Section 1122 "does not prohibit the placement of substantially similar claims in different classes."[30] Since the separate classification in this case was not for the purpose of obtaining an accepting class of claims, the separate classification is not prohibited.[31] If all limited partners had been placed in the same class, their vote still would have been to accept the Plan, even if the Wellington vote had been excluded.[32] Wellington and Bond Purchase were placed in a separate class because they have both expressed a desire to control the debtor, and because the debtor and the other limited partners will not be well-served if Bennett and Johnson are both involved post-confirmation. The fact that each of them has attempted to gain control of the debtor, to install his own general partner and management company, and to pay management fees to their respective companies, justifies separate treatment.[33] Thus, the different treatment accorded Wellington and Bond Purchase—by requiring the unsuccessful bidder to sell its interest at the auction price—is not only permissible, but it is necessary to enable the debtor to effectively carry out its Plan.[34]

For all these reasons, I find that the Plan properly classifies claims.[35]

■ Bond Purchase also contends that the Plan was not proposed in good faith. That argument fails. At the outset of this case, debtor proposed a Plan which was not confirmable, and which did not give Bond Purchase and the other holders of limited partnership interests the value of their interests. Accordingly, that Plan was rejected, and the Court gave the debtor and Bond Purchase the opportunity to offer competing Plans. On April 30, 1999, this Court entered an Order rejecting both Plans, and gave both proponents the opportunity to submit new Plans. Both parties filed new Plans, but Bond Purchase chose not to ask the Court to confirm its Third Amended Plan. Instead, Bond Purchase has objected to confirmation of debtor's Fifth Amended Plan. That Plan both restructured the debtor's obligations, and supplied the mechanism for the purchase by the winning bidder of limited partnership interests at their fair market value as determined by an auction. Thus, both Bond Purchase and Wellington have the same opportunity to own an interest in the debtor. In so doing, the Plan honors the well-recognized policies underlying Chap-

---

**30.** *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987).

**31.** *Id.* (where the Court found that the discretion to place similar claims in different classes will be carefully scrutinized if the purpose of the separate classification is to obtain an accepting class.)

**32.** *See* 11 U.S.C. § 1126(c) and (e).

**33.** See *In re U.S. Truck Co.,* 800 F.2d 581, 587 (6th Cir.1986) (where the Court allowed separate treatment because the union had a differ-

ent stake then the other impaired creditors in the future viability of the reorganized company. It had a non-creditor interest in the ongoing relationship between its members and the debtor). *See also, Hanson v. First Bank of South Dakota,* 828 F.2d at 1313.

**34.** *See, Mickelson v. Leser (In re Leser),* 939 F.2d 669, 672 (8th Cir.1991) (holding that child support claims can be separately classified if the debtor cannot carry out a plan without the separate classification).

**35.** 11 U.S.C. § 1122(a).

ter 11, those being the preservation of going concerns and the maximization of recovery to creditors and interest holders.[36] Exposing the limited partnership interests to the market will result in maximizing their value, and will at the same time allow the debtor to remain in business. I find that the Plan and its proponent comply with the applicable provisions of Title 11, and that the Plan has been proposed in good faith and not by any means forbidden by law.

 Next, Bond Purchase contends that the Plan is not feasible.[37] I find that the Plan is feasible. As to the creditor BMA, the Plan provides that the principal due BMA will be reduced by $500,000.00, and BMA has accepted that treatment. Debtor has made monthly payments on the BMA debt throughout the course of this case. I find that debtor will be able to meet its restructured obligations to BMA. The Plan further contemplates that, at the request of BMA, debtor shall place $1.25 million in an interest-bearing construction escrow account to be used for the renovation of the apartment complex. Those funds have been placed in the account of debtor's counsel. In the debtor's Plan, all other creditors are to be paid in cash in full on the Effective Date of the Plan. In the event the successful bidder does not pay the claims on or before the Effective Date, the Plan will fail and the Order Confirming the Plan will be vacated. The same holds true for the sellers of limited partnership interests. The sellers are to be paid, in cash, on or before the Effective Date. In the event the sellers are not paid, the Plan will not be consummated. Given the short period of time, and given the safeguards in place in the event the successful bidder does not comply with the Plan, I find that the Plan is feasible.

There were no issues raised at the hearing as to any other confirmation points.

Based on the files and records in the case, as well as the representations offered without objection at the hearing held on July 26, 1999, I find the Fifth Amended Plan of Reorganization offered by the debtor meets all other requirements of Section 1129 of the Code, and should be confirmed.

An Order of Confirmation in accordance with this Memorandum Opinion will be entered this date.

---

**36.** *Toibb v. Radloff,* 501 U.S. 157, 163, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991).

**37.** 11 U.S.C. § 1129(a)(11).